# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | |
| ROMANY FALTAS GEBRAEIL | : | Mag. No. 04-3752 |

**RECEIVED**

DEC 7 — 2004

AT 8:30_____M
WILLIAM T. WALSH
CLERK

I, Andrew Rosenbaum, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From in or about August 1997 to in or about February 1998, in the District of New Jersey, and elsewhere, defendant ROMANY FALTAS GEBRAEIL did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud financial institutions and to obtain money, funds, and assets owned by and under the custody and control thereof, by means of materially false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Sections 1344 and 2.

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached page and made a part hereof.

Andrew Rosenbaum, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
December 7, 2004, at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE         Signature of Judicial Officer

ATTACHMENT A

I, Andrew Rosenbaum, a Special Agent of the Federal Bureau of Investigation ("FBI"), having conducted this investigation and discussed this matter with other law enforcement officers who have participated in the investigation, have knowledge of the following facts:

1. During the course of this and other investigations, I have spoken with other law enforcement officers, representatives of credit card companies, and other witnesses. I have also reviewed documents, including, but not limited to credit card statements, documents concerning credit card transactions, and checks used to pay credit card bills, during the course of this investigation.

2. As a result of my training and experience, I am familiar with a fraudulent credit card scheme commonly referred to as a "bust out." Although there are several variations, in general terms, the scheme operates in the following manner. The perpetrators obtain numerous credit cards from a variety of issuers, including financial institutions. Over a relatively short period of time, usually over a span of only a few months, the perpetrators make large purchases and apply for cash advances, without the means and intent of ever making bona fide payments relating to same. When the total amount of their purchases and cash advances on their credit cards reach their credit limits, they frequently submit, or permit others to submit, checks to the card issuers that they know will not be honored due to insufficient funds in the perpetrators' accounts. After the fraudulent payments are credited to their accounts but before the victim credit card issuers are notified that the checks would not be honored, the perpetrators use and permit others to use the credit cards to make additional purchases and cash advances. In order to avoid the collection efforts of their creditors and for the purpose of keeping all of their illegal proceeds, the perpetrators frequently file for bankruptcy in order to attempt to obtain a complete discharge of all their debts.

3. As a result of my training and experience, I am also aware that the individuals in whose name the various credit cards are issued oftentimes are recruited by individuals who have experience in organizing and effectuating the day-to-day activities of the scheme. The recruiter entices the cardholders with the prospect of charging hundreds of thousands of dollars in cash, household appliances, jewelry and other valuable merchandise to their credit cards and then wiping out their debt by filing for bankruptcy. In exchange for a portion of the proceeds, the recruiter convinces them to provide copies of their credit cards along with their credit card convenience checks, checking account checks, social security numbers and other identifying information to facilitate the fraud.

4. Based upon my training and experience, I am also aware that these recruiters oftentimes direct the cardholders to apply for many new accounts and to supply falsely inflated wage and salary information on their credit applications in order to obtain higher credit limits.

5. During the course of this investigation, law enforcement agents have had several conversations with a Cooperating Witness (hereinafter referred to as "CW-1"). According to CW-1, s/he and defendant ROMANY FALTAS GEBRAEIL engaged in a "bust out" scheme that

defrauded approximately ten financial institutions, as well as several other credit card issuers, of more than $184,000 in loss. Law enforcement agents also have had several conversations with a second Cooperating Witness (hereinafter referred to as "CW-2"). According to CW-2, s/he and defendant GEBRAEIL engaged in a similar, but unrelated, "bust out" scheme that defrauded approximately 13 financial institutions and other credit card issuers of more than $225,000 in loss. At defendant GEBRAEIL's direction, CW-1 and CW-2 each filed bankruptcy petitions at the conclusion of their respective schemes, for the purpose of executing the fraud and eliminating their debt.

7. CW-1 and CW-2 have independently stated, in substance and in part, that defendant ROMANY FALTAS GEBRAEIL recruited each of them to commit credit card "bust out" schemes, and that defendant GEBRAEIL directed and supervised the entire activity. Both CW-1 and CW-2 stated that defendant GEBRAEIL opened and caused to be opened numerous credit card accounts with various financial institutions in each CW's name.

8. According to CW-1 and CW-2, defendant ROMANY FALTAS GEBRAEIL used the credit cards and caused the credit cards to be used to make purchases at various retailers located in New Jersey, for goods such as electronic equipment, clothing, household furniture, appliances, jewelry, and airline tickets. CW-1 and CW-2 further stated, in substance and in part, that defendant GEBRAEIL used and caused to be used the credit cards to obtain tens of thousands of dollars in cash advances at ATMs and casinos in New Jersey, giving CW-1 and CW-2 a portion of the cash proceeds.

9. The records that have been obtained during the course of this investigation confirm that almost all of CW-1's more than $184,000 in credit card debt was incurred during a seven-month period, from in or about August 1997 to in or about February 1998. These records further confirm that during these same time periods, over $27,000 in cash advances was obtained from credit cards issued to CW-1. These cash advances were never repaid.

10. The records that have been obtained during the course of this investigation confirm that approximately 18 checks, totaling over $25,000, were submitted on CW-1's behalf to the various financial institutions that issued CW-1 credit cards. These checks, all of which were subsequently returned for insufficient funds, were used to fraudulently inflate the available credit on CW-1's credit card accounts, thus enabling CW-1 and defendant ROMANY FALTAS GEBRAEIL to obtain cash advances and merchandise in amounts greatly exceeding the credit limits on those accounts.

11. Records obtained during this investigation further confirm that, among other credit cards, CW-2 held at least two American Express cards issued in his name, one of which was an Optima account issued by American Express Centurion Bank. These records confirm that from in or about January 1998 to in or about February 1998, CW-2 used his Optima card to obtain approximately $4,980 in cash, goods, and services, none of which was ever repaid. During this same time period, two checks, totaling approximately $9,891.19, were submitted to American

Express Centurion Bank on CW-2's behalf. These checks were both returned for insufficient funds.

12. CW-2's remaining American Express card was an American Express Gold Card. From in or about September 1997 to in or about February 1998, this card was used to obtain approximately $48,000 in cash, goods, and services, none of which was ever repaid. During this time period, approximately 12 checks, totaling approximately $29,278.99, were submitted to American Express on CW-2's behalf. Each of these checks were returned for insufficient funds.

13. CW-1, CW-2, and defendant ROMANY FALTAS GEBRAEIL used credit cards issued by the following financial institutions to perpetuate the scheme described above: American Express Centurion Bank, Citibank, Bank One, Beneficial National Bank, Capital One Bank, FDS Bank, Monogram Bank, and Sears National Bank. At all times relevant to this matter, each of these victims was a financial institution as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation.